UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CONTINENTAL ADVISORS S.A., ET AL.,**<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>**GSV ASSET MANAGEMENT, LLC, ET AL.,**<br><br>　　　　Defendants. | Case No.  14-cv-05609-YGR<br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Re: Dkt. No. 43 |

On June 11, 2015, defendants moved to dismiss plaintiffs' First Amended Complaint for failure to state a claim.  (Dkt. No. 43 ("Mot.").)[1]  Plaintiffs opposed the motion.  (Dkt. No. 46 ("Oppo.").)  The motion was heard on September 1, 2015.

The Court previously granted a motion to dismiss the plaintiffs' initial complaint with leave to amend.  (Dkt. No. 32.)  Generally, as in the initial complaint, plaintiffs allege the defendants—GSV Asset Management ("GSV") and two of its principals—fraudulently induced the plaintiffs to conduct "road shows" and otherwise seek out potential investors in Twitter, Inc. ("Twitter") shares prior to the company's initial public offering ("IPO").  (Dkt. No. 35 ("FAC") ¶¶ 1-19.)  According to the FAC, "[t]he fake offering was designed to see if those shares could generate interest at a specific price to help boost the value of Twitter in an eventual IPO of its

---

[1] In conjunction with their motion, defendants filed a request for judicial notice of the Second Amended Complaint and a court order filed in *Precedo Capital Group Inc.*, *et al. v. Twitter Inc.*, Case No. 13-CV-7678 (S.D.N.Y.), as well as the August 22, 2012 Mandate Agreement between Continental Advisors SA and GSV Asset Management, LLC (Dkt. No. 40-6) referenced throughout the FAC.  (Dkt. No. 43-7.)  The Court **GRANTS** the request for judicial notice.  *See* Federal Rule of Evidence 201(b)(2); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("[A] court may take judicial notice of 'matters of public record.'"); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (granting requests for judicial notice of filings in other litigation); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (noting a trial court may consider, on a Rule 12(b)(6) motion to dismiss, "documents incorporated into the complaint by reference").

shares," and defendants "never intended to complete any sale of the shares being 'offered.'" (*Id.* ¶ 1.) In the FAC, plaintiffs assert eight counts: (i) breach of contract;[2] (ii) breach of the implied covenant of good faith and fair dealing; (iii) fraud; (iv) fraudulent inducement; (v) aiding and abetting fraud; (vi) tortious interference with business relations; (vii) unjust enrichment; and (viii) negligent misrepresentation. (*Id.* ¶¶ 164-244.)[3]

Having carefully considered the papers submitted, the record in this case, and the arguments of counsel, and good cause shown, the Court hereby **GRANTS IN PART** and **DENIES IN PART** the motion.

## I.  BACKGROUND

Plaintiff Continental Advisors S.A. ("Continental Advisors") is described as a Luxembourg-based "boutique investment advisory and consultancy" firm. (FAC ¶ 20.)[4] Plaintiff Precedo Capital Group LLC ("Precedo") is an Arizona-based placement agent and consultant. (*Id.* ¶ 21.) Both assist companies seeking to sell large blocks of shares to institutional investors, brokers, and investment banks. (*Id.* ¶¶ 20-21.) Continental Advisors focuses on international investors, Precedo on domestic investors. (*Id.* ¶¶ 20-21.) Andreea Porelli and Mark Porcelli are partners at Continental Advisors. (*Id.* ¶¶ 28-29.) Tim Moran is a partner at Precedo. (*Id.* ¶ 30.)

Defendant GSV is a Delaware corporation with its principal place of business in Woodside, California. (*Id.* ¶ 22.) An investment advisory registered with the Securities and Exchange Commission ("SEC"), GSV was a general partner for @GSV Fund, L.P. ("GSV Fund")[5] during the time period at issue. (*Id.*) GSV was a manager and advisor to GSV Capital

---

[2] As the Court noted at the hearing, as there are two contracts at issue (each between a single plaintiff and the corporate defendant), there are in fact two breach of contract claims asserted.

[3] The FAC does not clearly indicate which cause of action is asserted by which plaintiff(s) against which defendant(s). At the hearing, plaintiffs clarified that they both assert only counts 1-4 and 6-7 against defendant GSV and counts 3-7 against defendants Michael Moe and Matthew Hanson.

[4] The complaint's non-conclusory factual allegations are generally accepted as true for purposes of considering this motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[5] GSV Fund is a publicly traded investment management company, focusing on securities of rapidly growing venture capital-backed companies. (FAC ¶ 25.)

2

Corp. ("GSV Capital"). (*Id.*) Defendant Michael Moe, a California resident, is a broker and investment advisor and GSV's co-founder, chairman, CEO, chief investment officer, and president. (*Id.* ¶ 23.) Moe "is recognized as one of the best and brightest investors on Wall Street." (*Id.*) For instance, *Business Week* named him "one of the best stock pickers in the country." (*Id.*) Defendant Matthew Hanson, a New York resident, is a broker, a managing partner at GSV, and a member of the management team for GSV Capital. (*Id.* ¶ 24.)

Twitter, an online social network that facilitates the transmission of 140-character limited "tweets," filed its S-1 registration with the SEC in October 2013 and had its IPO the next month. (*Id.* ¶ 26.) The 51-page FAC describes a purported "fake offering" orchestrated in the run-up to the IPO, intended by Twitter and defendants to use plaintiffs' services to "generate interest" in Twitter shares at a certain price point. (*Id.* ¶ 1.) Plaintiffs allege defendants "never intended to complete any sale of the shares being 'offered.'" (*Id.*) Instead, they allegedly induced plaintiffs to enter into and perform under Mandate Agreements with GSV through false statements, primarily by falsely claiming to have the exclusive right to sell a large block of privately owned Twitter shares, valued at nearly $300 million, in conjunction with the IPO. (*Id.* ¶¶ 2-6.) The Mandate Agreements provide that plaintiffs would receive certain fees only if the transactions at issue—namely, the sale of shares to plaintiffs' investors—were consummated. (*Id.* ¶ 12.) Defendants allegedly knew these conditions would never be met when the agreements were formed and always planned to cancel the offering before its completion. (*Id.* ¶¶ 13, 39.)

Among other, less detailed allegations of fraud, plaintiffs allege the following:[6]

- As to Precedo:

---

[6] Other allegations of purported fraud are typically conclusory or lack the requisite specificity under Rule 9 (e.g., referencing statements to plaintiff entities generally without specifying the individual representatives who purportedly received the statements or listing large date ranges during which statements were allegedly made). Other statements, such as those purportedly resulting in continued reliance and performance by plaintiffs after execution of the Mandate Agreements, often lacked a factual basis establishing the statements were false, other than in a conclusory fashion (e.g., statements that GSV had a longstanding relationship with Twitter or "the fund can't close til Twitter signs off") (FAC ¶¶ 84-85.) Allegations that defendants showed plaintiffs a shareholder list or slides including non-public material "reasonably believed to have been provided by Twitter" are not specifically alleged to be fraudulent. (*Id.* ¶¶ 92-93.)

- By Moe: "In or around February 2012," Moe called Precedo's Tim Moran and falsely told him of an "exclusive" opportunity GSV held to sell certain blocks of shares because of its "long-term relationship with Twitter management." (*Id*. ¶¶ 45-49.)
- By Hanson: On an April 9, 2012 call between Moe, Hanson, and Precedo's Tim Moran and John Holland, Hanson falsely stated GSV Fund had exclusive access to the block of shares at issue. (*Id*. ¶ 52.)
- By Moe: On April 18, 2012, Moe falsely claimed the offering in question was exclusive to "his firm" while presenting the opportunity at Precedo's Scottsdale, Arizona office to potential investors. (*Id*. ¶¶ 55-56.) It is not clear from the FAC if any Precedo representatives attended the presentation.
- By Hanson: After GSV and Precedo entered into a Mandate Agreement, on sales calls between May 6, 2012 and August 1, 2012, Hanson falsely claimed to Precedo's Tim Moran and to potential investors that the shares in question were available only to GSV. (*Id*. ¶ 60.)

• As to Continental Advisors:

- By Hanson: "On or about August 10, 2012," Hanson "falsely represented" to Continental Advisor's Andreea Porcelli that GSV had exclusive access to the shares in question. (*Id*. ¶ 64.)
- By Hanson: After GSV and Continental Advisors entered into a Mandate Agreement on August 20, 2012, Hanson misrepresented to Continental Advisors and its investors that GSV had authority to sell the shares at issue. (*Id*. ¶ 87.)
- By Hanson: On September 15, 2012, Hanson told Continental Advisor's Mark Porcelli that GSV could arrange for an inspection of Twitter's financials for a large buyer. (*Id*. ¶ 96.) (There is no direct allegation that this statement was false, only inference.)
- By Hanson: On September 17, 2012, "Hanson contacted Moe by telephone

4

and Hanson falsely reported to Mark Porcelli that five million shares of Twitter stock traded at $19 per share in an unknown private transaction, making the transaction purportedly worth approximately $95 million." (*Id*. ¶ 98.) (As alleged, it is unclear whether Porcelli was supposedly on the call or whether the information was reported at a later date.)

- o By Hanson: On September 17, 2012, Hanson emailed the Porcellis, informing them of a recent sale of a "5M share block" at $19 and noting that "[w]e still have 15M shares available, but clearly there is some big institutional appetite out there for Twitter." (*Id*. ¶ 99.) There is no record of such a sale having taken place, and Hanson is alleged to have known as much. (*Id*. ¶¶ 100, 102.)

GSV and Precedo entered into a Mandate Agreement on May 6, 2012. (*Id*. ¶ 59.) The Mandate Agreement between GSV and Continental Advisors is dated August 20, 2012. (Dkt. No. 40-6 ("MA").) Plaintiffs purportedly entered into the agreements in reliance on those aforementioned allegedly false statements made prior to execution of the agreements. (FAC ¶¶ 67, 73.) The Mandate Agreements explicitly note GSV "is not obligated to compensate [Precedo or Continental Advisors] (i) in the event the Fundraising is not consummated or (ii) for investments offered to the Fund that [GSV] does not accept." (*See* MA § 1(c); FAC ¶ 73 (noting both agreements were "substantially similar").) After entering into the agreements, defendants expended funds in arranging various investor road shows. (FAC ¶ 19.) For instance, Precedo arranged presentations to accredited investors throughout the United States. (*Id*. ¶¶ 71-72.) Continental Advisors, in turn, organized an 18-day international road show, presenting the offering to institutional investors in eight countries, starting in Milan, Italy and concluding in Singapore. (*Id*. ¶ 74.)

Plaintiffs purportedly arranged for investors to purchase an aggregate of approximately $260 million worth of the GSV block of Twitter shares. (*Id*. ¶¶ 117, 119, 122.) On October 2, 2012, after Continental Advisors learned a third party was also offering the same block of shares, it became clear that GSV did not have the exclusive right to sell the shares in question. (*Id*. ¶

132.) On October 5, 2012, "Hanson told Mark Porcelli and Tim Moran that Twitter was canceling the offering and falsely represented that the cancellation was because an unidentified Merrill Lynch broker had been calling institutional clients on Wall Street and telling them that if they bought Twitter shares privately from him, it would provide them with preferential treatment and/or a guaranteed spot in Twitter's IPO." (*Id*. ¶ 115.) According to plaintiffs, despite the contrary language in the Mandate Agreements, "if the offering could be canceled at any time, no one would agree to work as a placement agent (like Precedo or Continental Advisors) because it would be a waste of time and resources for a sale that might not occur for reasons other than a price dispute or a lack of investor interest." (*Id*. ¶ 124.) Thus, plaintiffs allege, they earned their fees under the agreement simply by finding interested investors, even though the contemplated transactions were never completed. (*Id*.) "Plaintiffs' damages include lost fees, commissions, out-of-pocket expenses incurred in obtaining the accredited purchasers of Twitter stock, and reputational harm." (*Id*. ¶ 153.)

## II.     LEGAL STANDARD

"Federal Rule of Civil Procedure 8(a)(2) requires only a 'short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007) (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original). Even under the liberal pleading standard of Rule 8(a)(2), "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (internal brackets and quotation marks omitted)). The Court will not assume facts not alleged, nor will it draw unwarranted inferences. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

Pursuant to Rule 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal for failure to state a claim under Federal Rule of Civil

Procedure 12(b)(6) is proper if there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)). The complaint must plead "enough facts to state a claim [for] relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. If the facts alleged do not support a reasonable inference of liability, stronger than a mere possibility, the claim must be dismissed. *Id.* at 678-79; *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences").

Additionally, Rule 9 establishes a heightened pleading standard for allegations of fraud. Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (To be alleged with particularity under Rule 9(b), a plaintiff must allege "the 'who, what, when, where, and how'" of the alleged fraudulent conduct.); *see also Tatung Co. v. Shu Tze Hsu*, 43 F. Supp. 3d 1036, 1060 (C.D. Cal. 2014) (applying Rule 9(b)'s heightened pleading standard to state law claims brought in federal court). Moreover, where a plaintiff alleges "a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim[,] . . . the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1103-04, 1106 (9th Cir. 2003) (holding "the circumstances constituting the alleged fraud [must] be specific enough to give defendants notice of the particular misconduct [alleged] so that they can defend against the charge and not just deny that they have done anything wrong" (internal quotations and citations omitted)).

**III.   DISCUSSION**

Defendants move to dismiss all of plaintiffs' counts for failure to state a claim. The Court

7

addresses each in turn.[7]

### A. Count One: Breach of Contract

Plaintiffs allege GSV breached the Mandate Agreements by failing to pay the specified commissions and fees despite plaintiffs' performance under the agreements by way of obtaining interested investors. (*Id*. ¶¶ 165-69.) According to plaintiffs, GSV's pre-existing knowledge that the "condition precedent to its obligations to pay"—namely, the consummation of sales—would never occur "excuses" its non-occurrence. (*Id*. ¶ 168.) Plaintiffs claim Continental Advisors is entitled to $25 million and Precedo $9 million in compensatory damages for the purported breach—the amounts they would have received under the agreements had the sales gone through—even though the sales in question did not occur. (*Id*. ¶ 170.)

As noted above, the Mandate Agreements include the following provision: "[GSV] is not obligated to compensate [Precedo or Continental Advisors] (i) in the event the Fundraising is not consummated or (ii) for investments offered to the Fund that [GSV] does not accept." (*See* MA § 1(c); *see also* MA § 9(a) (noting that except as specifically provided elsewhere in the agreement, "each party shall bear its own fees and expenses incurred in connection with the Fundraising.").) Plaintiffs are apparently savvy financial organizations, capable of facilitating deals for hundreds of millions of dollars. Under this provision, plaintiffs assumed the risk that despite their success in finding interested investors, the deal might ultimately not be consummated for some reason outside of their control, including GSV's or Twitter's unilateral decision not to accept offers. In light of this provision, the Court finds no breach of the express terms of the Mandate Agreements

---

[7] As a threshold matter, the Court notes that the contracts in question have a Delaware choice of law provision. The parties have apparently stipulated, for purposes of this motion, to the application of California law to the non-contract claims. (Dkt. Nos. 57-58.) In any event, they have asserted there are no material differences for purposes of this motion between the laws of California, Delaware, or Arizona (the three states identified as potentially providing governing law over causes of action in this case). (*Id*.) Thus, the Court need not conduct a choice of law analysis at this stage of the litigation, but will instead apply Delaware law to the contract claims and California law to the remaining claims. In connection with future motion practice in this case, the Court will apply California law unless a party invokes and adequately briefs an alternative. *See JMP Sec. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029, 1037 (N.D. Cal. 2012) ("In the absence of an effective choice-of-law agreement, California choice-of-law rules permit a court to apply the decisional rules of its forum state 'unless a party litigant timely invokes the law of a foreign state.'").

under the facts alleged.

Plaintiffs contend the "prevention doctrine" applies here to bar GSV from escaping its obligations under the contracts because it wrongfully prevented performance of the condition precedent—namely, the consummation of the planned investment (*see* Oppo. at 14-17). *See Mobile Commc'ns Corp. of Am. v. MCI Commc'ns Corp.*, No. 8108, 1985 WL 11574, at *4 (Del. Ch. Aug. 27, 1985) ("The 'prevention doctrine' provides that a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party *wrongfully* prevented performance of that condition precedent.") (emphasis supplied). However, as plaintiffs assumed the risk that the condition precedent would not occur for any number of reasons outside of their control, the doctrine does not apply. *See id*. at *4 (finding "the prevention doctrine does not apply where, under the contract, one party assumes the risk that fulfillment of the condition precedent will be prevented"); *see also A.I.C. Ltd. v. Mapco Petroleum Inc.*, 711 F. Supp. 1230, 1238 n.24 (D. Del. 1989) ("If, as here, defendant's alleged 'prevention' is authorized by the contract, then naturally it does not constitute a breach and cannot be considered 'wrongful.'").[8]

Thus, Count One fails to state a claim and is **DISMISSED**. Typically, leave to amend is liberally granted. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Chodos v. West Pub. Co.*, 292 F.3d 992, 1003 (9th Cir. 2002). One exception to this general rule of permissiveness, however, is where amendment would be futile. *Foman*, 371 U.S. at 182; *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1101 (9th Cir. 2004). Here, as plaintiffs have already been granted leave to amend without remedying these deficiencies and have proffered no additional allegations that could save the claims, the dismissal is **WITH PREJUDICE**.

### B. Count Two: Breach of the Implied Covenant of Good Faith and Fair Dealing

The implied covenant generally requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the

---

[8] Plaintiffs misplace reliance on the Restatement (Second) of Contracts (1981) for further support of this argument. However, the Restatement sections cited—sections 245 and 246—do not convert a claim for fraudulent inducement into one for breach of contract based upon excusing the non-occurrence of a condition.

contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotations omitted). Under Delaware law, "[w]here the contract speaks directly regarding the issue in dispute, '[e]xisting contract terms control . . . such that implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal documents.'" *Fortis Advisors LLC v. Dialog Semiconductor PLC*, No. 9522-CB, 2015 Del. Ch. LEXIS 22, at *10 (Del. Ch. Jan. 30, 2015) (quoting *Dunlap*, 878 A.2d at 441); *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (implied covenant claim alleging failure to pay money due under contract "must fail because the express terms of the contract will control such a claim."). Moreover, the covenant does not apply to claims concerning pre-contract negotiations. *See In re Student Fin. Corp.*, No. 02-11620, 2004 WL 609329, at *6 (D. Del. Mar. 23, 2004).

Plaintiffs allege defendants breached the implied covenant of good faith and fair dealing "by inducing [plaintiffs] to perform their obligations by finding interested investors for the offering of Twitter shares knowing that the offering would ultimately be canceled and that the conditions precedent to [plaintiffs'] receipt of their fees would never occur." (FAC ¶ 174.) However, the covenant only applies where "it is clear from the writing that the contracting parties 'would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter.'" *Dunlap*, 878 A.2d at 442; *see also Corporate Prop. Associates 14 Inc. v. CHR Holding Corp.*, No. CIV.A 3231-VCS, 2008 WL 963048, at *5 (Del. Ch. Apr. 10, 2008) (noting "a court cannot and should not use the implied covenant of good faith and fair dealing to fill a gap in a contract with an implied term unless it is clear from the contract that the parties would have agreed to that term had they thought to negotiate the matter"). Under plaintiffs' theory, defendants never intended for the contemplated transactions to occur. Therefore, a full negotiation regarding the proposed implied term—that GSV would not "induce Plaintiffs' performance while knowing GSV will never have to compensate Plaintiffs because GSV conditioned its compensation obligations on an event it knew would never occur" (Oppo. at 17-18)—would certainly not have made its way as a negotiated term into the agreements in question. Instead, full knowledge regarding the purported fraud in the inducement would have at most

10

1   resulted in plaintiffs' refusal to enter into the agreements. Thus, this claim is also **DISMISSED**.
2   The dismissal is **WITH PREJUDICE** as the claim fails as a matter of law as contradicted by
3   plaintiffs' overarching theory of the case.

        **C.**    **Counts Three and Four: Fraud and Fraudulent Inducement**

The elements of fraud are: "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004); *see also Parino v. BidRack, Inc.*, 838 F. Supp. 2d 900, 906 (N.D. Cal. 2011) ("Fraud in the inducement is a subset of fraud. It 'occurs when the promisor knows what he is signing but his consent is induced by fraud.'").

While many of the specific allegations of fraud and fraudulent inducement in the operative complaint lack the requisite specificity under Rule 9, there are enough sufficiently pled pre- and post-contract allegations—as outlined above—to state a plausible claim under both counts. In their motion, defendants argue their theory of the case—that Twitter merely changed its mind about pursuing the offering—is "far more plausible" than plaintiffs'. (Mot. at 18-19.) However, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im* plausible.") (emphasis in original).

The Court notes that the complaint does not sufficiently allege false statements by each defendant as to each plaintiff. However, the FAC alleges defendants participated in a conspiracy to defraud plaintiffs. (See FAC ¶¶ 158-163.) "[T]here is no absolute requirement that where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify *false statements* made by each and every defendant." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (noting, however, that Rule 9(b) requires each defendant be informed of the allegations surrounding his specific alleged participation) (emphasis in original). "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not

11

actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-11 (Cal. 1994) ("The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design."). While the conspiracy allegations in the operative complaint are sparse, the general theory—that defendants conspired amongst themselves and with Twitter to obtain plaintiffs' assistance to market an offering with no intention of consummating any deals through plaintiffs—is sufficiently plausible at this early, pre-discovery stage of the case. Thus, the motion as to the fraud claims is **DENIED**.

### D. Count Five: Aiding and Abetting Fraud

An aiding and abetting claim requires facts establishing that the person: (1) had actual knowledge of the underlying wrongful conduct, and (2) gave substantial assistance or encouragement to another to so act. *Casey v. U.S. Bank Nat. Ass'n*, 127 Cal. App. 4th 1138, 1144 (Cal. Ct. App. 2005). As discussed above in connection with plaintiff's conspiracy allegations, the aiding and abetting fraud claim is adequately pled as against defendants Moe and Hanson. Both individuals are plausibly alleged to have participated in concert in carrying out the purported scheme. Therefore, the motion as to this claim is likewise **DENIED**.

### E. Count Six: Tortious Interference with Business Relations

Both plaintiffs accuse all three defendants of tortious interference with business relations. The elements of the claim are "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional [wrongful] acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *See Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008) (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (Cal. 2003)) (dismissing claim where complaint did not allege disruption of ongoing business relationships with customers, such as a lost contract or a failed negotiation). The FAC specifically references the names of fifteen fund managers and investors, alleging they

12

are less likely to do business with plaintiff Continental Advisors as a result of defendants' conduct. (FAC ¶¶ 218-224.) The FAC includes similar allegations as to plaintiff Precedo, but does not list any such investors by name. (*Id.* ¶ 225.) The FAC alleges the resulting harm to Precedo is at least $9 million and $25 million in the case of Continental Advisors. (*Id.* ¶ 227.) While generally alleging defendants "knew" of the "existing business relationships" between plaintiffs and "their clients, customers, and institutional investors," and were aware that their conduct would "impact[]" these relationships, the FAC does not include allegations regarding *specific* pre-existing relationships of which all three defendants were aware or of any *specific* subsequent lost contracts, failed negotiations, or the like. Thus, the claim is **DISMISSED**. However, because plaintiffs indicated at the hearing that they could provide the requisite level of detail if given the opportunity, the dismissal is **WITH LEAVE TO AMEND**.

### F.  Count Seven: Unjust Enrichment

"The elements of unjust enrichment are 'receipt of a benefit and unjust retention of the benefit at the expense of another.'" *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1070 (9th Cir. 2014) (quoting *Lectrodryer v. Seoulbank*, 77 Cal. App. 4th 723, 726 (Cal. Ct. App. 2000)). Unjust enrichment is "synonymous with restitution." *Parino v. Bidrack, Inc.*, 838 F. Supp. 2d 900, 908 (N.D. Cal. 2011). Defendants argue the FAC fails to include sufficient factual allegations to support a plausible claim of unjust enrichment under Rule 9(b)'s heightened pleading standard—which applies to claims, such as this one, that sound in fraud. The Court agrees. Plaintiffs allege GSV—with Moe and Hanson as partners—held its largest position in Twitter stock, and therefore stood to gain to the extent plaintiffs' marketing activities ultimately increased the value of Twitter shares. (FAC ¶ 8.) However, tracing any such increase to plaintiffs' conduct is highly speculative. The FAC does not allege any specifics regarding an increase in the value of Twitter shares held by GSV directly attributable to plaintiffs' conduct, but merely alleges that the purpose of the purported scheme was to increase the value of those shares. (FAC ¶ 230.) Because plaintiffs did not suggest any additional allegations that could cure the deficiencies raised by defendants, the claim is **DISMISSED WITH PREJUDICE**.

### G. Count Eight: Negligent Misrepresentation

A negligent misrepresentation claim requires the same elements as a fraud claim, except the statement need only be made "without reasonable grounds for believing it to be true," rather than with knowledge of its falsity. *See Castillo v. Bank of Am., N.A.*, No. 14-cv-02957, 2014 WL 4290703, at *3 (N.D. Cal. Aug. 29, 2014) (denying motion to dismiss fraud and negligent misrepresentation claims) (citation omitted). As such, the motion as to this claim is **DENIED** for the same reasons as noted above in the discussion on plaintiffs' fraud claims.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the motion as follows:

1. Counts I (breach of contract) and II (breach of the implied covenant of good faith and fair dealing) are **DISMISSED WITH PREJUDICE**.

2. Count VI (tortious interference with business relations) is **DISMISSED WITH LEAVE TO AMEND**.

3. Count VII (unjust enrichment) is **DISMISSED WITH PREJUDICE**.

4. The motion is otherwise **DENIED**.

Any Second Amended Complaint shall be filed by **December 15, 2015**. Any response thereto shall be filed by **January 15, 2016** pursuant to Federal Rule of Civil Procedure 15(a)(3).

This Order terminates Docket Number 43.

**IT IS SO ORDERED.**

Dated: November 30, 2015

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

14